May it please the court. Good morning, new counsel. I'm here this time to represent Mr. Melvin Thomas, the appellant. Melvin Thomas is the career funder, Judge Ripple. But first I'd like to talk about the conspiracy count in this case. In our brief, we argued all the possibilities of how the government was making this into a conspiracy. Essentially, from my reading of the government's brief, I believe they've conceded that the only person that does qualify as a potential conspirator is Anita Andrews. So I'm going to focus on Anita Andrews. Conspiracy has had a very long history of, in our opinion, being overused and broadly stretched. And in this case, I think it's been stretched too far to include Anita Andrews as a co-conspirator. You know, I find that pretty interesting. Look, she drove him to Chicago on two to four occasions to pick up heroin from his supplier. She rented cars for him on other occasions for the same purpose. She drove him around Madison, Wisconsin on multiple occasions when he was making sales to his customers. She allowed him to store and pack heroin in her home. She even packaged the heroin herself for resale in one instance. And following his arrest, she removed the stored heroin from its hiding place and gave it to a friend for disposal. So there's far more here than mere association on her part. In a variety of ways, she knowingly, deliberately, and it seems to me pretty willingly, chose to give concrete assistance to this person. And his heroin trafficking. And so there is at least one person with whom Thomas conspired. I know, well, I agree with you. Well, rather, I should say, she may not have profited from her participation, but whatever her incentive was, she agreed with Thomas to commit illegal acts. And so what about it? It's not a conspiracy. I think that we're talking about willful agreement. And the question is whether she willfully did any of this. The trips to Chicago, she testified. What's the opposite of willfully? I don't understand. She knew what she was doing. She knows that she's driving. She knows that she's got heroin in the car. I don't think she knew all the time when she had heroin in the car. I don't mean all the time. She didn't know on various occasions that she was carrying heroin for this guy. So what's the possible absence of willfulness? I think she was forced into many of the acts she did. He told her that he would be physically violent to her if she did not participate. What do you mean forced into it? She could have gone to the police at any point. He didn't have 24-hour surveillance of her. I think she could have, but when the police did come, I think her conduct shows that she was afraid. She lied to them first and said that she didn't know anything about it. She was afraid or just trying to help him out, keep him out of trouble. Her testimony at trial does not seem to be of a woman who's willing to help Mr. Thomas out. She was angry with him. What was she doing? Did he threaten her? Did he make her? He absolutely threatened her. She wasn't always in his presence when she was driving around with the heroin, was she? No. No. So why didn't she just, you know, quit? I think at some point she did, but then going to the police and saying, I'm living with someone who's dealing heroin, the response the police gave her is, you tell us everything or you're going to be a co-conspirator. She had children. She was a school bus driver. There is a lot of incentive for her not to tell police what's going on and just pick him out, which she eventually did. So I think that her willfulness is definitely in question, whether she entered into this agreement, whether she embraced the conspiracy. I do not understand that. If you're transporting heroin, that is a willful act. Ms. Christensen, did the district court make any findings on the issue of willfulness? The district court did not. It was part of the motion for judgment of acquittal, which the district court denied kind of a blanket denial of the sufficiency of the evidence. I see. He said nothing about his estimation of the facts. No, no specific findings. Ms. Christensen, one of the things that we have to deal with, whether it's in substantive conspiracy law or when we're dealing with guideline situation, is separating the accountability of individuals situated like Ms. Andrews from the principal malfactor. And it's always difficult because certain actions they take on really need to be considered part of their personal relationship with the malfactor and others are more related to the malfactor's illegal business. Can you give us any help or guidance as to really how we ought to articulate that line? Because I think that's a line that we have not yet articulated with the kind of specificity that perhaps we owe the district judges. I tend to agree. This court has the United States v. Hunt case, which the government relies on, and they're similar, but I see a line there, and that's where I think the distinction is. And where do you think the line is there in Hunt? I think the line is that Hunt went on the trip in that Hunt case, willingly knowing exactly what the purpose of the trip was. Ms. Andrews did not know every time. For instance, they went to Chicago to visit his family,  So what? So after that, she knew, right? I think at that point, is she embracing the conspiracy? Is she part of this conspiracy? Next you're going to say you murdered someone because, you know, you were afraid if you didn't carry out this order to murder, something bad would happen to you. So you say, well, that wasn't murder. It wasn't willful. That isn't exactly a defense if Andrews was at trial. Yeah, you actually believe that. I do believe if I'm in a car and someone gets out of the car to go do something illegal, rob a bank, rob a liquor store, I'm driving because later on we're going to dinner with somebody. He gets back in the car, I realize what he's done. I may, in fact, get out of the car and say, no, I'm done here. But if I'm in a city that I don't know, without transportation. I disagree with you totally. You're just excusing all sorts of criminal behavior. I think it does not take into account the relationship between women and men in these types of situations. Absolutely, the conspiracy has got to be stopped somewhere, and someone who doesn't willfully participate in the illegal object cannot be a conspirator. I think you're all wet. I respectfully disagree. Most people who commit crimes, they can point to pressures they're under, this, that. I think those pressures... You would limit criminal punishment to some kind of pure sadist or someone. Someone who had never acted under pressures from other people, but just under his own desire for money or killing people or what have you. No, I'd limit it to people who actually participate in the agreement to commit a crime, and I don't believe she did that in this case. Of course she did. Well, that's certainly our argument based on the facts of this case. I'll talk a little bit about maintaining premises. Judge Ripple, your question before was to whether he's a career offender. That does obviously make this a more difficult case, but the maintaining premises enhancement was part of the original calculation, which the judge... The what? Enhancement? I'm sorry, I didn't hear that. The maintaining of premises enhancement. I see. Right, and so it's part of the original calculation. He was then considered to be a career offender. The judge essentially rejected the career offender guidelines, which were quite high, they were 360 to life, and ultimately gave him a much lower sentence, I believe 216, although I know I'm getting the two cases messed up, but it was a lower than guideline sentence. It's within the heroin conspiracy sentence, and I believe that the judge had known that the premises did not apply, he would have given a lower sentence. So it depends on... He needed the premises enhancement to get the career offender designation? Is that right? No, no. The district court judge found he was a career offender and then rejected the career offender guideline, essentially. So that's our argument. My difficulty with that is he starts the sentencing proceeding in the transcript saying you're a career offender. Yes, yes, and legally he is, and then the judge is entitled to reject the career offender status. Both of these sentencing we had today, they're really kind of loosey-goosey. I mean, it's really the records in these cases. It's all about prosecutors protecting the record. Well, unfortunately, Your Honor, I get the cases that are given to me, and would I prefer a tighter record? Always, but it doesn't certainly always happen. Help me out on this stash house thing. You really see this enhancement. We're seeing it more. You're seeing it more now? Yes. And do we have a line as to where is the line between I live here and maybe have some of the stuff around, and I'm running a stash house. Where is the line? I'm not sure this court has articulated a line. I believe the last case this court found or made rulings on this, I believe it was Sanchez in January perhaps, and it seems to be almost like a balancing of how much time was a primary use for drugs and how much time was a primary use for a residence. And I really think when you're talking about a primary use, that balance needs to tip toward the drug use of the premises. The cases don't really seem to talk too much about it, but when we're trying to interpret the guideline, do we look at the statutory offense and how it's been interpreted there? Have courts done that? I have not seen courts do that. That statutory offense is even more rarely. Yeah. Charged. And my understanding of when this stash house guideline came into effect was to put kind of that statutory enhancement into the guidelines as an enhancement. I would imagine that's what they were up to. Right. And there are good reasons behind this. There are, particularly in depressed areas of cities, houses that are solely used as drug houses, and I think that's what we're trying to aim to do. That's kind of been the common understanding. Right, right. And I think that's a valid reason to impose an enhancement. But when you have something that's really tipping the scales 50-50, and I don't think this is that case even, I think it was more primary residence than anything else. Do we know what the legislative history of the statute says about what Congress was trying to get at when it passed the stash house? Yeah, I don't know off the top of my head. I certainly could provide the court with that information. My concern is that if we're getting into a work-at-home syndrome, are we going to see this enhancement in every distribution case where the guy had something around the house? Right. And is that compatible with the congressional intent? Are we going to see this used every conspiracy case? And if you tell me that we're seeing more of this, it seems like it's time for the Court of Appeals to start drawing some lines. Yeah. And if the line is that the guideline is to uphold the intent of Congress in passing the statute, we ought to know what the intent of Congress was. I agree. I agree. To draw that line, that would be important. I am seeing them more. But here, here, I absolutely cannot see a problem, because not only did he routinely store heroin in the home underneath that TV stand, but he was observed by both Andrews and her former roommate cutting packaging heroin in the residence. And, indeed, that roommate, Tina, or Trina, her testimony was that she saw him do this on seven or eight occasions, often retrieving a scale from the downstairs closet. And, of course, after, you know, following his arrest, they found a digital scale, cutting material, 22 sandwich bags with their corners cut out. I mean, there was a sound basis here for Judge Conley finding that Thomas had maintained the premises for the storage and distribution of heroin. I think if we're going to look at the guideline, the guideline shows several factors. And what you're saying is absolutely true, but that's merely one of the factors. The two that really go against that is that he did not have any possessory interest in the residence. He did not even have a key to the residence. She had to let him in and out. So for him using a premises as a premises. Well, I can't think of a circuit that hasn't held that it's not necessary for a defendant to have had an ownership or leasehold interest in the property in order for the guideline to apply. Because, look, that would enable a defendant to avoid culpability under the guideline by using someone else's residence as a stash house, just like he did here. And we often see that with girlfriends being the stash house. Yes, so your position is you want to encourage women to engage in criminal activity by giving them an excuse. Absolutely not. They just did it because, you know, it's a man, this, that. I want to recognize the relationship in some situations. Engaged in this drug activity. Obviously guilty. I'm not doing any favor for women, I don't think. Well, I'm here to represent Mr. Thomas, and unfortunately that comes with the arguments I'm making. I'm here to also argue that there's a certain type of relationship, that the guidelines are actually now recognized as an enhancement in 2D1.1B15. Defendants can get it if they use someone in a romantic relationship to forward their drug activity. And it is a recognized difficulty in these cases. I'm way beyond my time, and I thank the court for the call. Okay, thank you, Ms. Christiansen. Mr. Reinhard? Good morning, Your Honors. David Reinhard for the United States. There was ample evidence introduced at trial to support the conspiracy conviction. The conspiracy was between the defendant and Anita Andrews, and I won't go through it. Judge Rovner hit on all the things that Anita Andrews did for this defendant to further his drug distribution. Again, numerous, numerous times he drove him around Madison so that he could go to these hotels, parking lots, stores, and deliver heroin. And she was present during some of those times. See, your use of the word present is what bothers me here. It seems to me it's got to be more than tagging along. There's got to be some indication that they willfully joined the conspiracy. It's an act of the will. They joined the conspiracy. And that gets difficult when people have either familial or quasi-familial relationships with the principal. And can you help me out on where we draw those lines, how we articulate them? Well, I think you have to look at everything. And in this particular case, when we talk about willfulness, this defendant stated to Anita Andrews, and she testified under oath, that he told her, look it, I'm a heroin dealer. And then on the trips up to Chicago, he had, I think the testimony was thousands of dollars on him. He was making telephone calls to his heroin source, and she was there listening. She testified to that. She saw him packaging up the heroin. And I think the real – she was – she packaged heroin for him and instructed him. I think I agree with you on that. I see your point. But you represent the big guy, Uncle Sam. And I'm trying to get you to tell me how I should be writing opinions to draw this line. Because, I mean, I've got to decide the case, but I've also got to clarify the law in writing it. And that's what I'm trying to get you to help me. And I guess all I can tell you, you have to look at everything, the words and the actions of the conspirators in this case, and the fact that she packaged heroin for him, was there, was driving him around, so that that would assist him in dealing his heroin. So you're telling me I've got to use kind of a totality of circumstances approach. Correct. In, you know, motives, there was talk about a financial benefit by the defendant. Look, there's no authority that you have to receive a profit in order to become a co-conspirator. There's many different motives. In this case, it was a personal motive. It was really out of affection for this defendant. She wanted to curry favor with him so they could remain boyfriend and girlfriend. That's a perfectly – you know, that's a reason for why she did this. Other reasons could be the thrill of just committing crimes. So the whole financial or profit motive really is irrelevant in this case. Bonnie and Clyde. Correct. Going to the second issue, the enhancement for maintaining a drug house, the issue here is it was not objected to below. So we're under a plain error standard in that particular case, and the defendant cannot demonstrate that there was obvious error. And, again, Judge Rovner went through the things, the actions that the defendant stored and packaged the heroin at the residence throughout the conspiracy. Trina Harb told the agency, observed the defendant cutting it up, packaging it there. Anita Andrews said he stored it under the TV stand, a search of the residence. The evidence of drug dealing was found in the 22 sandwich bags with the corners cut out. And lastly, on the morning of the defendant's arrest, his very first call was to his mother. And in that call, the defendant repeatedly told his mother, tell Anita to check my stash spots and to get rid of it. I mean, stash house, stash spots, I mean, that's something very telling in regards to that particular enhancement. Anita said, yes, she went, she got the heroin, and had someone flush it down the toilet. And even if there was obvious error in this particular case, if they can demonstrate that, the defendant cannot demonstrate that it affected his substantial rights. The defendant was a career offender and was sentenced under the career offender guidelines in this particular case. Not 2D1.1, the drug guidelines. While his ultimate sentence was 18 years, which just happened to be within the drug guidelines, the court, the district court, never tied their reasoning to the fact these are the drug guidelines, so I am sentencing him here. The court specifically went through the 3553A factors and said, look at 18 years. To me, that sounds appropriate for this defendant, given his extensive criminal history, the fact that he really does fit in the heartland of career offenders. That's what the court indicated. How old is he? I believe he's late 30s. And he had four prior felony drug offenses and was on parole at the time of the offense, so this wasn't a 22-year-old individual whose first run-in with the law. But if there aren't any further questions, I have no further argument. Okay, thank you, Mr. Reinhart. So, Ms. Christensen, do you want another minute? It must have forecast questions. I think I have enough time. Okay, well, thank you very much. So the court will adjourn.